**[Cite as *State v. Smith*, 2021-Ohio-3997.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals No.  L-20-1085

　　　　Appellee                                  Trial Court No.  CR0201901275

v.

Matthew Avery Smith                          **DECISION AND JUDGMENT**

　　　　Appellant                                 Decided:

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Megan M. Patituce and Joseph C. Patituce, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1}  Defendant-appellant, Matthew Avery Smith, appeals the March 24, 2020 judgment of the Lucas County Court of Common Pleas, convicting him of aggravated murder with a firearm specification, murder with a firearm specification, and four counts

of felonious assault with firearm specifications. For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} On November 22, 2018, A.B. attended a family Thanksgiving celebration held in a meeting room at America's Best Value Inn in Northwood, Ohio. He brought his ten-year-old daughter, T.B., three-year-old son, M.B., and one-year-old son, C.B. Sometime between 8:00 and 9:00 p.m., A.B. prepared to take the children home. He and the two younger children walked out to his white Ford 500. He strapped the boys into the back seat—M.B. behind the driver seat and C.M. behind the passenger seat—and he pulled the car up to the hotel entrance to wait for T.B. While he waited for his daughter, A.B. smoked a cigar with his nephew, I.C., who had come outside. After several minutes, T.B. had not come out on her own, so A.B. went back in to get her. When they returned to the vehicle, T.B. got into the front passenger seat and A.B. drove off.

{¶ 3} A.B. took the Miami Street entrance and headed north on I-75. Soon after crossing the DiSalle bridge into Toledo, A.B. heard thumping sounds against his car over the sound of the music playing in his vehicle. He kept driving. He heard more thumps and the windows on the left side of the vehicle shattered. T.B. told her father she was bleeding. A.B. saw something white fly by and realized they were being shot at. He ducked and pushed his daughter down. He reached in the back seat with his right hand and felt around for M.B. and C.B.; he felt C.B. but not M.B.

2.

**{¶ 4}** A.B. exited the expressway on Erie Street and sped through downtown Toledo—running traffic lights and honking his horn—to St. Vincent Hospital's emergency department. A.B. grabbed M.B., who was slumped over in the back seat, and carried him inside to the first nurse he could find. M.B. was alive but unresponsive. He had been shot in the head. Surgery was performed to relieve the pressure on his brain and remove the blood clot caused by the bullet, but M.B. died in surgery. The surgeon extracted a .40 caliber bullet from M.B.'s head.

**{¶ 5}** Officers and detectives arrived at the hospital, secured A.B.'s vehicle, and spoke with A.B. A.B. told them what had happened and described the vehicle he saw as being a white vehicle resembling a PT Cruiser, but not a PT Cruiser. A.B.'s vehicle was towed to the Toledo Police impound lot, a secure location, where it was stored inside. The officers and detectives left the hospital to perform various tasks.

**{¶ 6}** Toledo Police Detective Gregory Mattimore went from the hospital to the America's Best Value Inn and requested security footage from the evening. In that footage, a white Chevy HHR can be seen following A.B.'s vehicle. Some of the occupants of the vehicle had entered the hotel and were captured in the security footage. The detective obtained still photographs of those individuals, which were distributed to other detectives.

{¶ 7} Some officers and detectives went to the approximate site of the shooting and closed off a portion of northbound I-75. They scoured the area for evidence and found bullet casings and fragments from a nine millimeter weapon.

{¶ 8} Detective William Goodlet left the hospital intending to go to the safety building to meet with other detectives and devise a plan of action. On his way to the safety building, however, he observed a white Chevy HHR at the Gas and Go gas station located at the corner of Cherry and Bancroft Streets. He saw some of the occupants of the vehicle. One of the individuals he observed at the gas station looked similar to one of the individuals depicted in the still photographs from the hotel.

{¶ 9} Detective Goodlet obtained the license plate number of the Chevy HHR and learned that it was registered to Ranisha Jones. Jones is Smith's mother. Other surveillance video was gathered from different spots along the route that A.B. took after leaving the hotel. In those videos, the Chevy HHR is seen following—and eventually driving alongside and pulling past—A.B.'s vehicle. The next day, police located the vehicle. It was examined at the Toledo Police impound lot. A fired shell casing for a .40 caliber bullet was found in the vehicle—the same caliber as the one extracted from M.B.'s head—as was an unfired round of the same caliber. Convex damage was observed to the interior passenger side of the Chevy HHR, consistent with having been struck by a bullet that was fired from inside the car.

4.

{¶ 10} Ultimately, the identification of the vehicle, images retrieved from the surveillance videos, and fingerprints taken from the Chevy HHR led police to suspect that Andre White, Kveon Giles, and Matthew Smith were involved in the shooting. White, who is serving 24 to 50 years in prison in Michigan for second-degree murder—committed under circumstances similar to the present case—spoke to detectives. Initially, White was less than forthcoming, but he eventually agreed to cooperate. He told detectives that he, Smith, Giles, D.L., D.M., and J.W. drove to the America's Best Value Inn. He, Smith, and D.M. went inside. D.M. went to the vending machine located in the lobby; White and Smith went to the counter to try to get a room, but were denied because they were too young. While inside, Smith told White that he had "seen a op [sic]." White explained that this meant that Smith had seen someone inside the hotel with whom he had had a dispute.

{¶ 11} After being denied the hotel room, White, Smith, and D.M. returned to the Chevy HHR. D.L. was in the driver's seat, Smith was in the front passenger seat, White was seated behind D.L., D.M. was seated in the middle, Giles was seated behind Smith, and J.W. was in the cargo area of the vehicle. They discussed whether to kill "the op." Not long after, I.C.—A.B.'s nephew, "the op"—came out with A.B. The men in the HHR debated whether to shoot them there or wait until they drove off. They decided to wait until they drove off. As they waited, they loaded their guns.

5.

{¶ 12} The men in the HHR followed A.B.'s vehicle onto the expressway and determined that they would shoot at the vehicle when they got close enough. They sped up to catch it, and Smith, Giles, and D.M. started shooting at the vehicle through opened windows on the passenger side. Smith and D.M. had Glocks, which utilize .40 caliber bullets; Giles had a Beretta that used nine millimeter bullets.

{¶ 13} White said that after the shooting, the men went to Smith's brother's house and picked him up, they went to the Quality Inn, to the Gas and Go on Cherry Street, to a party at a hall, to Steak and Shake, then back to the Quality Inn. Smith's mother was staying at the Quality Inn and rented them a room there.

{¶ 14} Giles's fingerprints were found on and in the HHR. Cell phone records showed that both Giles and Smith's phones pinged off the same cell towers located near the scene of the shooting. This—and the bullets and shell casings recovered from I-75, the vehicles, and the victim's head—was the only forensic evidence that corroborated White's version of events.

{¶ 15} Smith, Giles, and White were all indicted on charges of aggravated murder, a violation of R.C. 2903.01(A), a special felony, along with firearm specifications under R.C. 2941.145(A), (B), (C), and (F) and 2941.146(A), (B), and (D) (Count 1); murder, a violation of R.C. 2903.02(B) and 2929.02, a special felony, along with firearm specifications under R.C. 2941.145(A), (B), (C), and (F) and 2941.146(A), (B), and (D) (Count 2); and four counts of felonious assault, violations of R.C. 2903.11(A)(2) and (D),

6.

second-degree felonies, along with firearm specifications under R.C. 2941.145(A), (B), (C), and (F) and 2941.146(A), (B), and (D) (Counts 3-6).

{¶ 16} White entered a plea to the lesser-included offense of complicity to involuntary manslaughter with a firearms specification and complicity to felonious assault with a firearms specification. The charges against Smith and Giles were tried together to a jury. The jury found Smith and Giles guilty of all counts. The trial court imposed the following prison sentences, along with three-years' mandatory post-release control on Counts 4-6:

| Count | Charge | Sentence | Specifications |
|---|---|---|---|
| 1 | Aggravated murder | Life with parole eligibility after 25 years | Consecutive three-year term as to firearm specification and consecutive five-year term as to discharging firearm from a motor vehicle |
| 2 | Murder | Merged into Count 1 | Merged into Count 1 |
| 3 | Felonious assault | Merged into Count 1 | Merged into Count 1 |
| 4 | Felonious assault | Three years | Consecutive three-year term as to firearm specification; five-year term as to discharging firearm from a motor vehicle to be served concurrently with five-year firearm specification in Count 1 |
| 5 | Felonious assault | Three years | Three-year term as to firearm specification and five-year term as to discharging firearm from a motor vehicle to be served concurrently to firearms specifications for Count 1 |
| 6 | Felonious assault | Three years | Three-year term as to firearm specification and five-year term as to discharging firearm from a motor vehicle to be served concurrently to firearms specifications for Count 1 |

{¶ 17} Both Giles and Smith appealed, but only Smith's appeal is presently before this court. He assigns the following errors for our review:

**ASSIGNMENT OF ERROR 1:** DEFENDANT-APPELLANT'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO OBJECT TO THE INCLUSION OF A JURY INSTRUCTION ON COMPLICITY.

**ASSIGNMENT OF ERROR 2:** DEFENDANT-APPELLANT'S SIXTH AMENDMENT RIGHT WAS VIOLATED BY TRIAL COUNSEL'S FAILURE TO CHALLENGE CELL-TOWER EVIDENCE.

**ASSIGNMENT OF ERROR 3:** DEFENDANT-APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**ASSIGNMENT OF ERROR 4:** THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST DEFENDANT-APPELLANT.

## II. Law and Analysis

{¶ 18} In his first assignment of error, Smith claims that trial counsel violated his Fifth, Sixth, and Fourteenth Amendment rights by failing to object the inclusion of a jury instruction on complicity. In his second assignment of error, he argues that trial counsel violated his Sixth Amendment right by failing to challenge the cell-tower evidence. And

in his third and fourth assignments of error, he claims that his convictions are against the sufficiency and manifest weight of the evidence.

## A. Ineffective Assistance of Counsel

{¶ 19} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th Dist.1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

{¶ 20} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 9th Dist. Lorain No. 01CA007958, 2002-Ohio-4858, ¶ 16. To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in

9.

*Strickland,* there are "countless ways to provide effective assistance in any given case." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 21} Moreover, in matters involving trial strategy, "courts will generally defer to the judgment of trial counsel, even where 'another and better strategy' might have been available." *State v. Newsome*, 11th Dist. Ashtabula No. 2003-A-0076, 2005-Ohio-3775, ¶ 8, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). "A court will only consider reversing on these grounds where the choice of trial strategy so deviates from the standard of reasonableness 'that ordinary trial counsel would scoff at hearing of it.'" *Id.,* quoting *State v. Burgins*, 44 Ohio App.3d 158, 160, 542 N.E.2d 707 (4th Dist.1988).

### 1. The Jury Instruction

{¶ 22} The trial court instructed the jury on complicity. Smith argues that counsel was ineffective for failing to object to this instruction because "[t]he State, from beginning to end, had proceeded under a theory that both Mr. Smith and Mr. Giles were principal offenders." While Smith does not suggest that it was inappropriate for the state to proceed in this manner, he claims that the state's case was "devoid of an allegation of complicity." He points to the following evidence presented by the state as demonstrating its theory that Smith was the principal offender: (1) Smith's mother's vehicle was used in the commission of the offense; (2) Smith was at the hotel; (3) Smith planned the

attack; and (4) Smith was the first to shoot. Smith acknowledges that the state could not prove who fired the fatal bullet, but he insists that this fact alone "does not determine the appropriateness of a complicity instruction" because there is no requirement that only the person who fired the fatal bullet may be the principal offender. Rather, he argues, there can be more than one actual killer and, therefore, more than one principal offender.

{¶ 23} Smith contends that inclusion of the instruction was not harmless. He acknowledges that Giles's counsel unsuccessfully objected to the inclusion of the instruction, but he claims it is possible that the instruction was appropriate as to Giles but not as to Smith. Finally, Smith argues that the instruction should have been more narrowly tailored, although he does not describe in what manner.

{¶ 24} The state responds that the complicity instruction was proper as to both Giles and Smith, and trial counsel had no obligation to raise a meritless objection. It insists that even if Smith's counsel had objected, that objection—like Giles's—would have been properly overruled "because the evidence showed at least two defendants fired multiple shots from the car Smith occupied, and the State had not offered evidence as to who shot the bullet that caused the death of M.B." The state explains that "principal offender" is defined as the "actual killer," "one who personally performs every act constituting the offense," or "one who directly caused the death." It maintains that because the evidence in this case was unclear as to who fired the bullet and directly caused M.B.'s death, a complicity instruction was appropriate.

{¶ 25} The state distinguishes *State v. Keene*, 81 Ohio St.3d 646, 655, 693 N.E.2d 246 (1998), which Smith cited. As summarized by the state, the victim in *Keene* was shot multiple times. The evidence showed that a shot fired by Keene would by itself have killed the victim. The court held that the fact that a co-defendant "finished [the victim] off," did not alter Keen's role as principal offender. The state emphasizes that here, unlike *Keene*, the complicity instruction was appropriate because M.B. was struck by only one bullet, but three individuals shot at the car. It argues that the facts Smith points to—that Smith's mother's car was used, and Smith went into the hotel, planned the attack, and fired the shot—shows that Smith "supported, assisted, encouraged cooperated with, advised, or incited the principal in the commission of the crime" and shared the criminal intent. Those facts stop short of proving that Smith himself directly caused M.B.'s death.

{¶ 26} The court gave the following instructions to the jury regarding complicity:

> The State of Ohio has presented a theory that each Defendant acted in complicity with the principal offender in the commission of aggravated murder. A person who is complicit with another in the commission of a criminal offense is regarded as guilty as if he personally performed every act constituting the offense.

This is true even if he did not personally perform every act constituting the offense or was not physically present at the time the offense was committed.

I need you to go back on page seven and take your pens. The second line under complicity. Because complicity applies at this point to all of the charges, the two words aggravated murder should be scratched out, and it should be principal offender in the commission of an offense. There's a more direct citation that I will give you at each one of the individual charges as they come to you.

* * * It is no defense to a charge of complicity that no person with whom either Defendant was alleged in complicity had been convicted as a principal offender.

The Defendants cannot be found guilty of complicity unless the offense was actually committed.

* * *

Before you can find either Defendant guilty of complicity in the commission of aggravated murder you must find beyond a reasonable doubt that on or about the 22nd day of November, 2018 in Lucas County, Ohio, the Defendant purposely aided or abetted in committing the offense of aggravated murder.

* * *

Before you can find either Defendant guilty of complicity by aiding and abetting you must find beyond a reasonable doubt that the Defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal offender in the commission of the offense, and the Defendant shared the criminal intent of the principal offender.

Such intent may be inferred from the circumstances surrounding the offense, including but not limited to presence, companionship, and conduct before and after the offense was committed.

The mere presence of the Defendant at the scene of the offense is not sufficient to prove in and of itself that the Defendant—or Defendants were aiders and abettors.

* * *

Before you can find either Defendant guilty of complicity in the commission of murder you must find beyond a reasonable doubt that on or about the 22nd day of November 2018, Defendant knowingly aided and abetted another in the commission of the offense of murder.

* * *

Before you can find either Defendant guilty of complicity in the commission of felonious assault you must find beyond a reasonable doubt

that on or about the 22nd day of November 2018, the Defendant knowingly aided and abetted another in the commission of the offense of felonious assault.

{¶ 27} As the parties mention, Giles's attorney objected to the complicity instruction. He argued that the state had not advanced the theory that the defendants had acted in complicity, but had stated in opening that each was the shooter. He claimed: "From opening statements until the conclusion of the State's case they have been tried as a principal." The state responded that opening statements are not evidence, and it could not say who fired the fatal shot, but it did provide evidence that the defendants engaged in the same act together, planned together, aided, assisted, and encouraged each other, and manifested the same goal, intent, and purpose while firing together. The court overruled Giles's objection because the physical evidence did not establish who fired the fatal bullet, and there was evidence that both Giles and Smith fired multiple bullets at the car and participated in coordination with one another.

{¶ 28} A charge of complicity may be stated in terms of [R.C. 2923.03], or in terms of the principal offense. R.C. 2923.03(F). "[I]f the evidence at trial reasonably indicates that the defendant was an aider and abettor rather than a principal offender, a jury instruction regarding complicity may be given." *State v. Szych*, 6th Dist. Lucas No. L-88-033, 1988 WL 101184, *3 (Sept. 30, 1988).

15.

{¶ 29} Here, there was evidence that the occupants of the Chevy HHR—including Smith and Giles—discussed whether and when to kill "the op" in the Ford 500, decided to wait until he drove away from the hotel, pulled alongside of the Ford 500, then began firing at the vehicle together. One shot hit M.B., but it was not established who fired the fatal shot. Under these circumstances, we find that a complicity instruction was appropriate as to both Giles and Smith. Had Smith's trial counsel objected to the instruction, his objection—like Giles's—would have been overruled. We, therefore, conclude that trial counsel was not deficient in failing to object to the complicity instruction, and even if he was, no prejudice resulted to Smith because there is no reasonable probability that, but for counsel's errors, the proceeding's result would have been different.

{¶ 30} We find Smith's first assignment of error not well-taken.

## 2. Cell-Tower Evidence

{¶ 31} In his second assignment of error, Smith argues that trial counsel was ineffective for failing to challenge the state's cell-tower evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Evid.R. 702. He maintains that cell-tower evidence is a scientifically questionable method of establishing location, and he insists that "[t]his was not a simple question of providing data, the source of which went unchallenged, but rather the interpretation thereof to established culpability."

16.

{¶ 32} The state responds that even if a *Daubert* hearing had been requested, Smith cannot demonstrate a reasonable probability that the outcome of the proceedings would have been different, particularly given that federal district courts have "almost universally" admitted similar cell-tower evidence. It acknowledges that there can be concerns with this type of evidence, but courts generally admit it so long as there is no "misleading aura of scientific infallibility."

{¶ 33} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage,* 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). We will not reverse a trial court's decision concerning the admission of relevant evidence absent an abuse of discretion. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126, 130 (1967).

{¶ 34} Special Agent Jacob Kunkle was permitted to testify as an expert witness concerning the location of cell towers with which the cell phones of the Chevy HHR's occupants communicated during the evening of November 22, 2018. Kunkle testified that he is a member of the FBI's Cellular Analysis Survey Team, a national team that specializes in historical phone record analysis. He examines the records that phones generate based on their use and determines the general location of where those communications are happening. Those records document which cell towers—and more specifically, which sides of those towers—are being used. He testified that cell phone

tower records analysis is reliable and he has testified in court about 50 times in many states across the country, including 30 times in Ohio.

{¶ 35} Using call record details and information concerning the places of interest here, Kunkle identified which towers Smith and Giles's phones used at various times. Simply summarized, Kunkle testified that at the "latter end of the 8:00 hour," Smith and Giles's phone were located in the area of the America's Best Value Inn, then moved north up toward Toledo. Kunkle explained that his analysis of the cell tower records can only show where the phone was located and cannot identify who had the phone. Moreover, those records can identify only the general area where the phone was located—within several square miles. He described the technique as accurate but imprecise.

{¶ 36} Under Evid.R. 702, a witness may testify as an expert if (A) his or her testimony either relates to matters beyond the knowledge or experience of a lay person or dispels a misconception common among lay persons; (B) he or she "is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony"; and (C) his or her testimony "is based on reliable scientific, technical, or other specialized information."

{¶ 37} The U.S. Supreme Court in *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and the Ohio Supreme Court in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735, established standards that Ohio courts generally use in

18.

evaluating the reliability of scientific evidence. Those standards require courts to consider "(1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." *Miller v. Bike Athletic Co.,* 80 Ohio St.3d 607, 611, 687 N.E.2d 735, 740 (1998), citing *Daubert* at 593-594.

{¶ 38} Smith complains that his counsel should have challenged the admissibility of Kunkle's testimony, and he claims that counsel's failure to do so resulted in "the introduction of scientifically questionable evidence without proper vetting." But courts have frequently taken the position that comparing cell phone data records to locations where a crime has occurred does not require specialized knowledge, skill, experience, training, or education, therefore, a *Daubert* hearing is unnecessary. *See State v. Johnson*, 2018-Ohio-1389, 110 N.E.3d 800, ¶ 25 (8th Dist.). To the contrary, federal courts widely accept the use of cell phone location records to determine the general location of a cell phone, and Ohio courts have been following suit. *Id.* at ¶ 26, citing *State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 28 (2d Dist).

{¶ 39} In *Jones*, for instance, the court determined that even though a crime analyst's testimony comparing the location of a cell phone to certain cell towers had been admitted as expert testimony, that testimony was primarily lay witness testimony that was properly allowed without an Evid.R. 702 and *Daubert* analysis. *See also State v. Baker*, 2020-Ohio-7023, 166 N.E.3d 601, ¶ 21-46 (7th Dist), *appeal not allowed,* 162 Ohio St.3d

1413, 2021-Ohio-961, 165 N.E.3d 331, and *appeal not allowed,* 164 Ohio St.3d 1449, 2021-Ohio-3336 (rejecting appellant's argument that admission of testimony concerning cell phone location violated Evid.R. 702 and *Daubert*).

{¶ 40} In accordance with these other Ohio cases, we conclude that an Evid.R. 702 and *Daubert* analysis was not required in order to admit Kunkle's testimony concerning the location of the cell towers with which Giles and Smith's cell phones communicated on the evening of November 22, 2018. We find that trial counsel was not ineffective for failing to object to Kunkle's testimony on these bases. We find Smith's second assignment of error not well-taken.

### B. Sufficiency and Manifest Weight of the Evidence

{¶ 41} In his third and fourth assignments of error, Smith argues that his convictions were against the manifest weight of the evidence and were not supported by sufficient evidence. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence

20.

or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 42} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 43} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

21.

## 1. Aggravated Murder

{¶ 44} Smith was convicted of aggravated murder under R.C. 2903.01(A). R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *."

{¶ 45} Smith argues that there was insufficient evidence to prove that he purposely and with prior calculation and design caused the death of another. He also claims that his conviction is against the manifest weight of the evidence because the "only evidence" of his involvement came from White, whose testimony he described as "self-serving." He insists that White's testimony should be viewed with the "utmost of scrutiny and suspicion" given that his cooperation was rewarded with significantly less prison time than he originally faced. He emphasizes that "White downplayed his involvement, instead pinning the principal conduct on Mr. Smith" and White had been involved in a similar murder in Michigan where, like here, "he claimed to have been nothing more than a bystander."

{¶ 46} Smith describes other evidence against him—the use of his mother's vehicle and the cell-tower evidence placing him in the vicinity of the murder—as "circumstantial." He insists that this evidence "did not point decisively" to his "direct involvement."

{¶ 47} The state responds that there was sufficient evidence to support each of Smith's convictions. As to his conviction for aggravated murder, the state claims that the

22.

jury saw surveillance recordings of the Chevy HHR following A.B.'s vehicle, and it heard White's testimony that Giles, D.M., and Smith discussed when to shoot the "op," decided to wait until the car left the parking lot, loaded their guns while they waited, followed A.B.'s car, sped up to catch up to the car, then fired shots as they passed the vehicle. The state emphasizes that the fact that the "op" was the target—not M.B.—is irrelevant, as is the fact that the fatal shot may have been fired by someone other than Smith.

{¶ 48} The state also counters that White was cross-examined about the crimes in Michigan and the details of his plea in Lucas County and admitted that he was initially not forthcoming when he made a statement to police. It argues that the jury could weigh the information and admissions against the other evidence in the case, including the surveillance recordings and cell tower records, which corroborated White's statements as to who was present and the sequence of events. The state insists that the fact that those considerations were resolved against Smith does not render the jury's findings against the manifest weight of the evidence.

{¶ 49} We agree with the state. There was evidence presented that Smith, purposely and with prior calculation and design, killed M.B. White testified that Smith is the person who identified "the op" at the hotel. He described how the occupants of the vehicle—including Smith—discussed whether to kill "the op" in the parking lot or wait until the vehicle exited the hotel. The decision was made to wait until the vehicle left, at

23.

which time the occupants of the Chevy HHR loaded their guns, followed the Ford 500, sped up to it, pulled alongside it, and started firing at it. White testified that Smith was among the occupants who fired at the vehicle. Smith is pictured in the footage from the hotel, his mother's vehicle was used in the commission of the offense, bullets of the same caliber as the one White claimed Smith fired were found in the Chevy HHR and were of the same type as the bullet extracted from M.B.'s head. And the cell-tower evidence placed Smith's phone in the vicinity of the murder at the time of the murder. There was sufficient evidence to support Smith's conviction.

{¶ 50} As for the weight of the evidence, the jury was informed that White had been convicted of murder in Michigan and had reached a plea agreement with the state, significantly reducing the potential prison sentence to which he was exposed. Given White's status as an accomplice to the crimes, the trial court specifically instructed the jury that his testimony is "subject to grave suspicion" and must be weighed "with great caution." But it was ultimately for the jury to conclude whether to believe White's testimony. We cannot say here that the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered, especially given the surveillance footage, the corroborating cell-tower evidence, and the fact that Smith's mother's vehicle was used in the commission of the offense.

24.

## 2.  Murder and Felonious Assault

**{¶ 51}** Smith was convicted of four counts of felonious assault under R.C. 2903.11(A)(2).  R.C. 2903.11(A)(2) provides that "[n]o person shall * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."  Smith was also convicted of murder under R.C. 2903.02(B).  R.C. 2903.02(B) provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

**{¶ 52}** Smith claims that there was insufficient evidence to support his conviction for felonious assault, and he claims that there was insufficient evidence that he caused the death of another through his commission of a felonious assault.  In support of these claims, Smith again argues that the only meaningful evidence against him came from White, who accepted a plea agreement in exchange for his testimony despite the fact that he had been implicated and convicted of a similar crime in Michigan.  The state responds that evidence that shots were fired in the direction of an occupied vehicle is sufficient to support a conviction of felonious assault as to all the vehicle's occupants.

**{¶ 53}** For the reasons we already explained, we cannot say here that the jury clearly lost its way in resolving evidentiary conflicts against Smith.  As for his convictions on four counts of felonious assault, the evidence demonstrated that there

25.

were four occupants in the Ford 500—A.B. and his three children—thus Smith was properly convicted of one count of felonious assault as to each of the occupants. *See, e.g., State v. Anderson*, 5th Dist. Richland No. 2020 CA 0068, 2021-Ohio-2316, ¶ 33. Appropriately, Smith's murder conviction (and one count of felonious assault conviction underlying the murder conviction) were merged with Smith's conviction for aggravated murder.

### 3. Firearms Specifications

{¶ 54} Under R.C.2941.145(A), a three-year mandatory prison term is properly imposed upon an offender where "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." Under R.C. 2941.146(A), a five-year mandatory prison term is properly imposed upon an offender "for committing a felony that includes, as an essential element, purposely or knowingly causing or attempting to cause the death of or physical harm to another and that was committed by discharging a firearm from a motor vehicle * * *." Smith does not specifically challenge the sufficiency and weight of the evidence with respect to his convictions for the firearms specifications, however, there was evidence that, if believed, demonstrated that Smith fired shots from a firearm, and that he did so from a vehicle. We find that there was sufficient evidence to support these convictions and the jury's findings were not against the manifest weight of the evidence.

26.

{¶ 55} We find Smith's third and fourth assignments of error not well-taken.

## III.  Conclusion

{¶ 56} Trial counsel was not ineffective for failing to object to the jury instruction on complicity or for failing to object to the admissibility of the cell-tower evidence.  We, therefore, find Smith's first and second assignments of error not well-taken.  Smith's convictions were not against the sufficiency or manifest weight of the evidence.  We, therefore, find his third and fourth assignments of error not well-taken.

{¶ 57} We affirm the March 24, 2020 judgment of the Lucas County Court of Common Pleas.  Smith is ordered to pay those costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.

28.